**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

|  |  |  |
|---|---|---|
| LINDA L. BATTS<br>3212 Gwynns Falls Parkway<br>Baltimore, Maryland 21216 | : | |
| *Plaintiff*, | : | **Case No.** |
| v. | : | |
| MAYOR AND CITY COUNCIL<br>    OF BALTIMORE<br>100 North Holliday Street<br>Baltimore, Maryland 21202 | : | |
| & | : | |
| BALTIMORE CITY DEPARTMENT<br>    OF PUBLIC WORKS<br>Abel Wolman Municipal Building<br>200 Holliday Street<br>Baltimore, Maryland 21201 | : | |
| *Defendants.* | : | |

**COMPLAINT
(Jury Trial Demanded)**

Plaintiff LINDA BATTS, by and through undersigned counsel, brings this civil action against

Defendants, the Mayor and City Council of Baltimore ("the City") and the Baltimore City Department of

Public Works ("DPW"), and in support thereof states as follows.

**INTRODUCTION**

1.      This is an action for employment discrimination and retaliation brought under Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the Age Discrimination

in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"); 42 U.S.C. § 1981 (via 42 U.S.C. § 1983);

and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 *et seq.*

1

2.      Plaintiff, a highly experienced Black female professional over the age of 60, was hired in July 2019 as the first-ever Director of Equity and Environmental Justice for DPW.

3.      Rather than supporting her mandate to root out discrimination, DPW leadership obstructed her efforts, engaged in flagrant discriminatory practices against Black and female employees, and ultimately terminated Plaintiff in retaliation for her fierce opposition to these unlawful practices.

4.      Before filing this Complaint, in February 2022, Plaintiff first sought administrative relief. The Equal Employment Opportunity Commission (EEOC) investigated Plaintiff's claims and issued a Determination finding "evidence establishes a violation of the Civil Rights Act of 1964." *See* Exhibit 1.

5.      Plaintiff brings this action to vindicate her civil rights, to recover lost prior and prospective wages and damages for the severe emotional distress caused by Defendants' conduct, and to ensure no other public servant is punished for opposing discrimination in one of the most broken and regressive agencies in Baltimore City government.

## JURISDICTION & VENUE

6.      This Court has original jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law. Specifically, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343 (civil rights), 42 U.S.C. § 1981, 42 U.S.C. § 2000e-5(f)(3) (Title VII), and 29 U.S.C. § 626(c) (ADEA).

7.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state-law claims arising under the Maryland Fair Employment Practices Act.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein occurred within the City of Baltimore, Maryland, and the employment records relevant to the unlawful practices are maintained and administered in the District of Maryland (Northern Division).

**PARTIES**

9.      Plaintiff Linda Batts, who is a Black adult female resident of the State of Maryland (Baltimore City), was at all times relevant to this Complaint an "employee" of Defendants within the meaning of Title VII and the ADEA.

10.      Defendant Mayor and City Council of Baltimore ("the City") is a municipal corporation organized under the laws of the State of Maryland.

11.      Defendant Baltimore City Department of Public Works ("DPW") is an agency of the City. At all times relevant to this Complaint, Defendants were an "employer" within the meaning of Title VII, MFEPA, and the ADEA. At all relevant times, Defendants employed more than fifteen (15) employees.

**CONDITIONS PRECEDENT**

12.      Plaintiff has exhausted all remedies and conditions precedent including timeliness, deferral, and all jurisdictional requirements necessary for the maintenance of this action against Defendants. Plaintiff sets forth additional facts in this section that would not typically be included to make clear that, if Defendants raised any timeliness issues, the doctrine of equitable tolling would apply. *See Cervantes v. City of San Diego*, 5 F.3d 1273, 1277 (9th Cir. 1993) (holding that the issue of equitable tolling must be considered when "the complaint, liberally construed in light of our 'notice pleading' system, adequately alleges facts showing the potential applicability of the equitable tolling doctrine").

13.      In February of 2022 Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 531-2021-02825.

14.      Plaintiff participated fully and in good faith in the EEOC investigation. On November 29, 2024, the EEOC issued a determination finding reasonable cause to believe Defendant violated Title VII. *See* Exhibit 1 – EEOC Determination, at p. 1 ("I have determined that the evidence establishes a violation of the Civil Rights Act of 1964, as amended, with respect [sic] discharge based in retaliation").

15.     On December 10, 2024, at 11:26 AM, Plaintiff explicitly instructed EEOC Supervisory Investigator James Swan via email to update her contact information. Plaintiff wrote: "James, Thank you. Please remember to use my samuel1008@verizon.net as my email. I was unaware that this was parked in my Gmail account, which is my lesser used account." *See* Exhibit 2. This ratified and confirmed the removal of a Gmail account (lindabatts1008@gmail.com) that Plaintiff had used during prior stages of the investigation but was no longer her principal email account.

16.     Plaintiff's December 2024 email communication was not the first time Plaintiff advised EEOC Investigator Swan of her preferred email address. In fact, as early as January 21, 2022, Plaintiff asked EEOC Investigator Swan to use her Verizon address (samuel1008@verizon.net) as her contact email as opposed to her Gmail address. *See* Exhibit 3 ("Also, my better email is samuel1008@verizon.net as opposed to the gmail."). On January 24, 2022, EEOC Investigator Swan responded by thanking Plaintiff for her email, thereby confirming receipt of the correspondence. *See id.* ("Thank you for your email.").

17.     In August 2023, Plaintiff repeated her request to use her Verizon email address, writing "Hi James: Thank you and please remember to use the email for me at samuel1008@verizon.net." *See* Exhibit 4. EEOC Investigator Swan responded to this, acknowledging the request in writing and by using the Verizon email address in his response. *See id.*

18.     Thus, Plaintiff requested the use of her Verizon email address on no less than three separate occasions, in 2022, 2023, and 2024, all in writing, all to an EEOC representative, and all confirmed in written responses by that EEOC representative. *See* Exhibits 2-4.

19.     The EEOC Investigator also acknowledged this address change by directing subsequent correspondence, including the proposed Conciliation Agreement, to Plaintiff's Verizon address (samuel1008@verizon.net) in December 2024 and January 2025, thereby ratifying Plaintiff's Verizon email address as her legal "address of record," exactly as Plaintiff requested. *See* Exhibit 5A & 5B.

20.     On February 25, 2025, the EEOC issued a Notice of Conciliation Failure, informing Plaintiff that the Title VII claims were being referred to the U.S. Department of Justice ("DOJ") for

litigation review. On that same day, Plaintiff emailed EEOC Investigator Swan to confirm whether a Notice of Right to Sue would issue in the event that DOJ declined to litigate. *See* Exhibit 6 ("The right to sue will follow if DOJ declines, correct?"). EEOC Investigator Swan responded by email, confirming that the DOJ would "email" Plaintiff the right to sue should it decline to litigate. *See id.* ("Yes, that is correct. The DOJ will email you the right to sue if they decline to litigate.").

21.    On July 11, 2025, after several months of not receiving any communication from the EEOC, Plaintiff again emailed EEOC Investigator Swan to inquire about the status of the Notice of the Right-to-Sue from the Justice Department. *See* Exhibit 6 ("Have you heard anything from DOJ about my case? Are you able to follow through with them?"). On that same day, EEOC Investigator Swan responded by email, acknowledging that he had not received any communication from the DOJ and indicating that he would follow up. *See* Exhibit 7. ("I have not heard anything from them. I will follow up now."). EEOC Investigator Swan did not thereafter provide any further response or follow-up to Plaintiff until Plaintiff contacted him again in December 2025. *See id.*

22.    Specifically, on December 8, 2025, Plaintiff once again emailed EEOC Investigator Swan, inquiring for a third time about the status of her EEOC claim. *See* Exhibit 7 ("Have you heard anything from DOJ?"). On December 17, 2025, EEOC Investigator Swan finally responded to Plaintiff's inquiry. EEOC Investigator Swan reported that, apparently, the Notice of Right-to-Sue had been issued on May 7, 2025, but it had been sent to Plaintiff's old email address — the very address Plaintiff referenced in her email from one year earlier (December 10, 2024) when she reminded EEOC Investigator Swan to use a different Verizon email address ([samuel1008@verizon.net](mailto:samuel1008@verizon.net)) because she did not check that old account as often, the same request Plaintiff made twice before that in both 2023 and 2022.

23.    In his email response to Plaintiff, EEOC Investigator Swan admitted the following with regard to the right-to-sue Notice: "This is the first I am hearing of this or seeing it. I don't know why I was not attached to the initial processing of the Notice of Right to Sue. I even inquired with DOJ in July about the status of your Notice of Right to Sue and I did not hear anything back." *See* Exhibit 8.

24. The suggestion from the EEOC's representative in July 2025 that nothing had yet happened was factually false (as the Notice had in fact been issued in May) and affirmatively misled Plaintiff into believing that the administrative process was still ongoing. Plaintiff reasonably relied on this representation from the EEOC investigator assigned to her case and awaited further instruction.

25. Plaintiff did not receive effective notice of her right to sue due to an EEOC administrative error that failed to use her updated email address for that critical correspondence. Plaintiff exercised diligence throughout the process, repeatedly contacting the EEOC to ask about her right-to-sue letter. In fact, had EEOC Investigator Swan learned of and shared the right-to-sue notice in July 2025 when he assured Plaintiff he would look into it, Plaintiff would still have been well within 90 days of May 7, 2025.

26. Plaintiff reasonably relied on representations from the EEOC Investigator assigned to her case, who advised her that she would be contacted by email once the agency issued its right-to-sue notice, who stated in July 2025 that he had not heard anything and that he would look into it, and who apparently did not himself learn of the May 2025 notice of her right-to-sue until December 2025.

27. After first learning on December 17, 2025, of the notice of her right-to-sue, Plaintiff immediately and diligently inquired with law firms in order to hire an attorney to file her complaint. Despite difficulties in making contact during and on the eve of the holiday break, Plaintiff persisted and retained undersigned counsel by early January.

28. Plaintiff initiated this lawsuit as soon as practicable upon obtaining actual notice, swiftly retaining seasoned counsel in the midst of the holidays, promptly providing counsel with all supporting documents, and immediately thereafter filing this Complaint. Accordingly, where there is both diligence by Plaintiff and agency error and misinformation, under well-settled doctrines of equitable tolling, this Complaint is timely filed. *See Blumberg v. HCA Management Co., Inc.*, 848 F.2d 642, 644 (5th Cir. 1988) (including among the possible bases for equitable tolling "the EEOC's misleading the plaintiff about the nature of her rights").

## FACTUAL ALLEGATIONS

29.     Defendants hired Plaintiff in July 2019 as the first-ever Director of Equity and Environmental Justice within the Baltimore City Department of Public Works ("DPW").

30.     Plaintiff previously served as Director of Equal Opportunity in the Office of the Comptroller of the Currency, the federal agency responsible for the licensing, regulation, and supervision of the nation's chartered banks, and before that as Special Assistant to the Commissioner of the U.S. Customs and Border Protection (CBP), where she directed the federal agency's civil rights programs.

31.     When she was hired in Baltimore City, Plaintiff reported to the DPW Director, initially Rudy Chow, and later Acting Director Matthew Garbark. Plaintiff's position was a professional, non-policymaking role responsible for identifying, advising on, and reporting civil rights compliance risks related to DPW employment practices, facilities, and programs, including compliance with Equal Employment Opportunity ("EEO") laws and Title VI environmental justice requirements.

32.     At the same time, Plaintiff was instructed to work at the Office of Civil Rights to rebrand it as the Office of Equity and Civil Rights and to supervise the Equity Division within that office. At the Office of Equity and Civil Rights, she reported to Darnell Ingram. In short, Plaintiff held two different jobs, reporting to two different supervisors.

33.     At no point in either position did Plaintiff possess authority to discipline employees, set City policy, or make final employment decisions.

34.     Throughout her employment, Plaintiff performed her job duties satisfactorily or better and was never disciplined or demoted.

35.     Plaintiff brought to the attention of DPW leadership, *inter alia*, the unlawful practice of systematically declining to give "outstanding" performance ratings to a predominantly Black workforce; complaints within Water and Wastewater at one facility of a racially hostile work environment described as a "plantation"; the mistreatment of Black employees by white managers at that same facility; the denial of female employees equal access to restroom facilities; the failure to include language advising employees

7

of their rights in settlement agreements resolving discrimination claims; the discriminatory and hostile working environment facing Sanitation workers in the Bureau of Solid Waste; the lenient treatment of white supervisors accused of discriminatory misconduct, and the retaliatory termination of senior employees who raised concerns about pay equity.

36.     Nothing constructive was done to address these myriad concerns, and Plaintiff was uniformly castigated and ultimately terminated for documenting and highlighting evidence of a wide range of unlawful activity and civil rights violations.

37.     For example, immediately upon assuming her role in July 2019, Plaintiff observed Human Resources officials at DPW instructing managers that "no one was to receive an 'Outstanding' rating" on their performance evaluations.

38.     Plaintiff vocally opposed this illegal directive, explaining to HR leadership and the Chief of Staff that arbitrarily limiting performance ratings in an agency with a predominantly Black workforce violated merit principles and constituted unlawful race discrimination by suppressing Black employees' advancement. Although this practice was later discontinued as a technical matter, the chilling effect of this guidance impeded the fair and impartial evaluative process.

39.     In July 2019, Plaintiff investigated complaints at the Back River Wastewater Treatment Plant and uncovered a racially hostile work environment that employees have described — to Plaintiff and to others — as a "plantation" or "slave ship." Plaintiff received similar reports in the course of investigating complaints from employees at the Bureau of Solid Waste. These unlawful patterns are consistent with practices throughout DPW, which included subjecting employees to inhumane working conditions, systematic subordination and subjugation, and perceived and actual threats of retaliation and reprisal including loss of employment, more dangerous working conditions, and a return to incarceration for violating terms of probation. Plaintiff forcefully opposed these practices and paid the price for it.

40.     Specifically, Plaintiff received and substantiated credible reports that white managers, including two specific Division Managers, systematically mistreated Black employees while favoring white employees at that particular facility.

41.     Plaintiff reported these conditions to supervisory managers and to the Bureau Head of Water and Wastewater as well as to Acting Director Garbark and urged immediate corrective action, reasonably believing the conduct Plaintiff learned of or observed violated Title VII. Nothing was done to address Plaintiff's concerns.

42.     During ongoing visits to and inspections of the Back River High-Rate Building that took place in and around 2019 and 2020, Plaintiff discovered that male employees had access to an on-site restroom while female employees were required to leave the building to use restroom facilities.

43.     Plaintiff reported this bizarre and archaic disparity to the Bureau Head and to Acting Director Garbark, explaining that denying female employees equal access to facilities constituted unequal terms and conditions of employment in violation of Title VII. Nothing was done to address these concerns.

44.     In May 2020, Plaintiff attempted to resolve a discrimination complaint filed by a Black employee and drafted a settlement agreement containing standard language advising the employee of his rights in the event of a breach.

45.     An attorney with the Baltimore City Office of Legal Counsel responsible for defending DPW against discrimination claims, intervened and ordered Plaintiff to remove the breach-notification language informing employees of their rights.

46.     Plaintiff opposed this interference, warning that allowing defense counsel to dictate settlement terms created a conflict of interest and undermined the integrity and independence of the process. Nothing was done to address Plaintiff's concerns.

47.     In July 2020, a Black female employee reported that her white male supervisor entered the office and gestured at her as if he had a gun and demanded, "give me all of your money."

9

48.     Despite the severity of this threat of violence, DPW allowed the white supervisor to telework rather than imposing more stern and immediate discipline.

49.     Plaintiff opposed this lenient treatment, pointing out the racial disparity between discipline imposed on Black employees and the favorable treatment afforded to white supervisors accused of serious misconduct. Nothing was done to address Plaintiff's concerns.

50.     In September 2020, DPW terminated two individuals, a DPW chief of staff and a senior employee, shortly after they raised concerns about pay equity.

51.     Plaintiff explicitly warned Acting Director Garbark that these terminations appeared retaliatory and would have a chilling effect on employees seeking to raise civil rights concerns in a concrete and good faith manner. Nothing was done to address Plaintiff's concerns.

52.     Plaintiff raised all such concerns in good faith, through appropriate internal channels, and based on reasonable beliefs that DPW's practices violated federal and state anti-discrimination laws.

53.     Defendants and their agents were aware of Plaintiff's protected activity.

54.     During Plaintiff's employment, white male supervisors accused of serious workplace misconduct were retained or minimally disciplined while Plaintiff, a Black woman with no disciplinary history, was treated less favorably than similarly situated employees outside her protected classes.

55.     From late 2020 through early 2021, Plaintiff pressed Acting Director Garbark to address the racially hostile conditions and conflicts of interest that obstructed civil rights enforcement.

56.     On February 24, 2021, Plaintiff reported to DPW's internal auditor that HR investigations were biased and that her efforts to enforce civil rights laws were being obstructed.

57.     On or about March 5, 2021, Plaintiff arrived for a scheduled meeting with Acting Director Garbark to discuss unresolved civil rights matters. Instead, Acting Director Garbark and HR Director LaToya Curtis abruptly terminated Plaintiff's employment.

58.     Plaintiff's termination occurred directly after her fierce and protected opposition to discriminatory practices, retaliation, and internal irregularities. Ultimately, Plaintiff was terminated, *inter*

10

*alia*, for doing her job of ferreting out civil rights violations against vulnerable populations at DPW and seeking to redress those transgressions.

59.     When asked for a reason as to why Plaintiff was being terminated, Defendant stated only that it was "moving in a different direction." The stated reason for Plaintiff's termination was pretextual. DPW did not eliminate Plaintiff's position or the function she performed.

60.     The timing of Plaintiff's termination, the absence of a legitimate explanation, and Defendants' disparate treatment of similarly situated employees support an inference of discrimination and retaliation in violation of state and federal law. But for Plaintiff's protected activity and protected status, Defendant would not have terminated her employment.

## CAUSES OF ACTION

### COUNT I
### RETALIATION – TITLE VII
### (42 U.S.C. § 2000e-3)

61.     Plaintiff reasserts, reaffirms, and incorporates by reference all preceding allegations contained in paragraphs 1 through 60 as if fully set forth herein.

62.     Plaintiff engaged in protected activity under Title VII by, among other actions, opposing the discriminatory "no Outstanding rating" policy; reporting a racially hostile "plantation" environment and sex-based restroom disparities at the Back River facility; opposing the lenient treatment afforded to a white supervisor following a racially charged threat of violence; opposing the retaliatory termination of senior employees after they raised pay-equity concerns; and protesting the Baltimore City Office of Legal Counsel's interference in internal processes to resolve claims of discrimination by DPW.

63.     Defendant had knowledge of Plaintiff's protected activity. Plaintiff communicated her objections and concerns directly to DPW leadership.

64.     Defendant subjected Plaintiff to a materially adverse employment action by terminating her employment on March 5, 2021.

65. A causal connection exists between Plaintiff's protected activity and her termination. Plaintiff was terminated shortly after escalating complaints regarding discriminatory practices, the mishandling of these disputes, and conflicts of interest that undermined civil rights enforcement.

66. Defendants' stated reason for Plaintiff's termination — that the agency was "moving in a different direction" — was pretextual and served to mask unlawful retaliation.

67. Plaintiff's protected activity was a but-for cause of Defendants' decision to terminate her employment.

68. As a result of the foregoing, Defendant violated Title VII.

## COUNT II
## RACE AND SEX DISCRIMINATION – TITLE VII
### (42 U.S.C. § 2000e-2)

69. Plaintiff reasserts, reaffirms, and incorporates by reference all preceding allegations contained in paragraphs 1 through 68 as if fully set forth herein.

70. Plaintiff is an adult Black woman and a member of no less than two protected classes, including race and sex.

71. Plaintiff was qualified for her position and performed her job duties satisfactorily.

72. Defendants subjected Plaintiff to disparate treatment and a hostile work environment by obstructing her ability to perform her job duties — specifically her responsibility to investigate and remediate race discrimination — while permitting white male managers to engage with impunity in a wide range of discriminatory conduct.

73. Defendants terminated Plaintiff's employment.

74. Plaintiff was terminated under circumstances giving rise to an inference of unlawful discrimination, including both disparate treatment of similarly-situated white employees and supervisors and the agency's tolerance of race-based misconduct and disparate treatment of similarly-situated male employees and supervisors and the agency's tolerance of sex-based misconduct.

75.    Defendants terminated Plaintiff because of her race and sex and/or because she refused to be complicit in the agency's systemic discrimination against Black and female employees.

76.    As a result of the foregoing, Defendants violated Title VII.

## COUNT III
## AGE DISCRIMINATION – ADEA
**(29 U.S.C. § 621 *et seq.*)**

77.    Plaintiff reasserts, reaffirms, and incorporates by reference all preceding allegations contained in paragraphs 1 through 76 as if fully set forth herein.

78.    Plaintiff was born in 1955 and was over forty years of age at the time of her termination.

79.    Plaintiff was qualified for her position and continued to more than satisfy the legitimate expectations of her employers at all relevant times.

80.    Defendants terminated Plaintiff's employment and either replaced her duties with younger and/or less experienced personnel or dispersed her responsibilities to avoid the oversight of a senior, experienced Director who actively enforced civil rights compliance.

81.    Defendants' stated explanation that the agency was "moving in a different direction" was pretextual and reflects a euphemism commonly used to mask age-based animus against senior employees perceived as part of the "old guard" or as resistant to discriminatory management practices.

## COUNT IV
## VIOLATION OF 42 U.S.C. § 1981
**(ACTIONABLE VIA 42 U.S.C. § 1983)**

82.    Plaintiff reasserts, reaffirms, and incorporates by reference all preceding allegations contained in paragraphs 1 through 81 as if fully set forth herein.

83.    Section 1981 prohibits discrimination on the basis of race in the making, performance, modification, and enforcement of contracts, including employment relationships.

84.    Plaintiff's retaliatory and discriminatory termination was carried out by Matthew Garbark, who at the relevant time, served as Acting DPW Director.

85.     At all relevant times, Mr. Garbark served as the Agency Head and possessed final policymaking authority for DPW with respect to employment and termination decisions.

86.     Mr. Garbark's decision to terminate Plaintiff because of her opposition to racial discrimination and her efforts to enforce civil rights laws constituted an official act of the municipality.

87.     Accordingly, Defendants are liable under 42 U.S.C. § 1983 for the violation of Plaintiff's rights secured by 42 U.S.C. § 1981.

## COUNT V
## VIOLATION OF MARYLAND FAIR EMPLOYMENT PRACTICES ACT
### (MD. CODE ANN. § 20-601 *et seq.*)

88.     Plaintiff reasserts, reaffirms, and incorporates by reference all preceding allegations contained in paragraphs 1 through 87 as if fully set forth herein.

89.     At all times relevant to this Complaint, Defendants were an "employer" within the meaning of Md. Code Ann., State Gov't § 20-601(d).

90.     The Maryland Fair Employment Practices Act ("MFEPA") makes it an unlawful employment practice for an employer to discharge, refuse to hire, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of the individual's race, sex, or age. Md. Code Ann. § 20-606(a)(1).

91.     MFEPA further makes it an unlawful employment practice for an employer to discriminate or retaliate against any of its employees because the employee has opposed any practice made an unlawful employment practice by MFEPA. Md. Code Ann. § 20-606(f).

92.     Defendants violated MFEPA by discriminating against Plaintiff on the basis of her race (Black), sex (female), and age (over 60) when they subjected her to disparate treatment compared to similarly situated white, male and/or younger employees and ultimately terminated her employment without legitimate justification.

93.     Defendants further violated MFEPA by retaliating against Plaintiff after she engaged in protected activity. As detailed above, Plaintiff opposed practices she reasonably believed to be unlawful,

14

including the systematic suppression of performance ratings for Black employees, the racially hostile "plantation"/"slave ship" environment at the Back River facility, the unequal access to restroom facilities for female employees, and the retaliatory termination of other staff members.

94. Defendants' stated reason for Plaintiff's termination — that they were "moving in a different direction" — was a pretext for unlawful discrimination and retaliation.

95. As a direct and proximate result of Defendants' unlawful discriminatory and retaliatory conduct in violation of MFEPA, Plaintiff suffered and continues to suffer significant damages, including but not limited to lost wages and benefits, emotional distress, humiliation, and other non-pecuniary losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that Defendants violated, *inter alia*, provisions of Title VII, ADEA, 42 U.S.C. §§ 1981 & 1983, and MFEPA;

B. Award Plaintiff back pay and front pay;

C. Award compensatory and punitive damages as permitted by law;

D. Award reasonable attorneys' fees and costs; and

E. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

THIRUVENDRAN VIGNARAJAH
AIS# 0812180249
Law Offices of Thiru Vignarajah
211 Wendover Road
Baltimore, MD 21218
(410) 456-7522
thiru@thirulaw.com

15

## **CERTIFICATE OF SERVICE**

I hereby CERTIFY that on this 4th day of February, 2026, a copy of the foregoing Complaint and Demand for Jury Trial was served via ECF/PACER and a copy sent by email to counsel of record:

Ebony M. Thompson
City Solicitor
Baltimore City Department of Law
City Hall
100 N. Holliday St., Suite 101
Baltimore, Maryland 21202
ebony.thompson@baltimorecity.gov

_____
Thiruvendran Vignarajah